UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CASE NO; 17-4550 (JMV)(JBC)

ROBERT MARGOLIS, an individual,
NEIL PODOLNICK, an individual,
KELLY HASSON, an individual,
ALBERTO HASSON, an individual,
and others similarly situated,

        Plaintiffs,

vs.

WARNER CHILCOTT (US), LLC, a limited
liability company with offices in New Jersey, and
ALLERGAN, PLC,

        Defendants,
_____/

## THIRD AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs, by and through their undersigned counsel, sue Defendants, and respectfully allege as follows:

## THE PARTIES

1.      This is an action seeking, inter alia, a declaration that Plaintiffs' waiver of federally-granted ADEA rights in their Separation Agreements from Warner Chilcott (US), LLC was invalid in each case because the ADEA waiver was procured as a result of fraud and misrepresentation.

2.      Defendant WARNER CHILCOTT (US), LLC ("Warner Chilcott"), is a limited liability company organized under the laws of the state of Delaware, with its principal place of business located at 100 Enterprise Drive, Rockaway, NJ 07866-2129.

3.      Warner Chilcott is an indirect subsidiary of Warner Chilcott, PLC, a publicly traded, for profit company organized, under the laws of Ireland, with its principal place of business

located at 100 Enterprise Drive, Rockaway, New Jersey, 07866-2129. Warner Chilcott PLC is listed on the NASDAQ Stock Exchange under the symbol WCRX.

4. On October 30, 2009, Warner Chilcott PLC acquired the global branded pharmaceuticals business of Procter & Gamble Company's ("P&G"), and began to operate all or part of the same in the United States through Warner Chilcott.

5. In 2013, Warner Chilcott PLC and its subsidiaries were acquired by Irish public liability company Actavis, PLC in a stock-for-stock transaction.

6. In June 2015, Actavis PLC changed its name to Allergan PLC. Thus, the original P&G branded pharmaceutical business is operated today by Defendant Allergan, PLC ("Allergan"). Allergan is sued in this action so that any relief awarded against Warner Chilcott will also be awarded against Allergan.

7. Defendant Allergan has its administrative headquarters in the United States at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

8. Defendants conduct business in the District of New Jersey.

9. Plaintiffs were all highly experienced and successful pharmaceutical sales representatives for P&G at the time P&G's global branded sales division was acquired by Warner Chilcott PLC and Warner Chilcott.

10. Plaintiffs Robert Margolis and Neil Podolnick reside in the Southern District of Florida.

11. Plaintiffs Alberto and Kelly Hasson reside in the Middle District of Tennessee.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this matter pursuant to federal question jurisdiction (28 U.S.C. §1331) as well as based upon the diversity of citizenship of the parties (28 U.S.C. §1332) and a disputed amount in controversy exceeding $75,000.

13. Pursuant to 28 U.S.C. §1391, and by virtue of a venue transfer order of the United States District Court for the Southern District of Florida, venue over this action is proper in the District of New Jersey.

## FACTS

14. Plaintiffs were long-time employees of P&G, until Warner Chilcott PLC's acquisition of P&G's global branded pharmaceuticals division, pursuant to which Plaintiffs became employees of Warner Chilcott.

15. Shortly after Plaintiffs became employees of Warner Chilcott, Plaintiffs were forced to resign involuntarily under duress, by virtue of illegal conduct by Warner Chilcott. Such illegal conduct is addressed at length in a successful Qui Tam Action by former employees in which Warner Chilcott and others have been found liable, according to a now-unsealed filing in United States of America ex rel. Lisa A. Alexander and James P. Goan, Relators, and on behalf of the states of California et al. (Plaintiffs) v. Warner Chilcott PLC, et al., United States Court for the District of Massachusetts, case no 11-CV-10545 RGS (the "Qui Tam Action"). A copy of the now-unsealed third amended complaint in the Qui Tam Action is attached as **Exhibit A**.

16. Plaintiff Robert Margolis had worked for P&G for 25 years before Warner Chilcott acquired the global branded pharmaceutical sales division. He had won numerous awards for his work, and was at the time 59 years old.

17. Plaintiff Neil Podolnick had worked for P&G for about 12 years before Warner Chilcott acquired the global branded pharmaceutical sales division. He had a successful career, and was 64 years old at the time.

18. Plaintiff Kelly Hasson had worked for P&G for about 12 years before Warner Chilcott acquired the global branded pharmaceutical sales division. She had a successful career, and was 46 years old at the time.

19. Plaintiff Alberto Hasson had worked for P&G for about 15 years before Warner Chilcott acquired the global branded pharmaceutical sales division. He had a successful career, and was 52 years old at the time.

20. Plaintiffs were each informed by P&G in 2009 of the sale of the branded pharmaceutics division to Warner Chilcott, and were told that they would henceforth be working for the acquiring party after the transaction closed.

21. Plaintiffs' employment status continued after closing of the Warner Chilcott transaction to acquire the global branded pharmaceutics division from P&G. Soon after closing, Warner Chilcott PLC and its subsidiary Warner Chilcott embarked on an aggressive program to improperly "thin the herd" of former P&G employees, whom they publicly called "cream puffs."

22. As detailed below, at the time Warner Chilcott caused Plaintiffs to resign involuntarily and under duress, Plaintiffs were not aware and could not have been aware that Warner Chilcott's actions were motivated by, and executed as part of, a scheme to commit Employment Discrimination in violation of the Age Discrimination in Employment Act ("ADEA") (the "Age Discrimination Scheme"). As detailed below, at the time that Warner Chilcott caused Plaintiffs to resign involuntarily and under duress, Warner Chilcott misrepresented the true reasons for "thinning the herd" of "cream puff" sales representatives, and Plaintiffs were not aware, and

could not have been aware with the exercise of due diligence, of the Age Discrimination Scheme until the same became public through un-sealed filings in the QuivTam Action that came to the attention of Plaintiffs during the period of October/November 2015 into 2016.

23. As part of this Age-Discrimination Scheme, as discovered through un-sealed filings in the Qui Tam Action that came to the attention of Plaintiffs during the period of October/November 2015 into 2016, Defendant Warner Chilcott took calculated, systematic steps to replace the older, experienced sales representatives (including without limitation Plaintiffs) acquired from P&G, by young, mostly female, sales representatives.

24. Once Warner Chilcott acquired the business form P&G, Warner Chilcott began to place demands on Plaintiffs to use illegal sales practices, which Plaintiffs refused to effectuate. These demands were in violation of the previous sales practices within P&G, and inconsistent with proper practices in the industry. Warner Chilcott's actions were intended to conceal their Age Discrimination Scheme and Warner Chilcott's concealment was successful until its Age Discrimination Scheme was discovered through unsealed filings in the Qui Tam Action that came that came to the attention of Plaintiffs during the period of October/November 2015 into 2016.

25. Defendant Warner Chilcott also engaged in a host of disturbing demands on Plaintiffs, knowing full well that such demands would cause Plaintiffs to fail in their positions, and Warner Chilcott's actions were intended to conceal their Age Discrimination Scheme. The offensive conduct by Warner Chilcott, included, without limitation, the following:

a. The company developed a system of kickbacks, where the company paid physicians in exchange for their agreement to prescribe certain drugs. The kickbacks took the form of attendance at expensive dinners, speaker fees for speeches never given, concert- and

      event tickets and golf trips. Some of Warner Chilcott's illegal sales tactics were not known to Plaintiffs at the time.

   b. Plaintiffs were ordered by their Warner Chilcott superiors to take at least two prescribing physicians for dinners each week, and were given incredibly large budgets for such dinners. When such physicians balked at participating at such dinners, Plaintiffs were then told they had to find a way or lose their jobs.

   c. Plaintiffs were also ordered by their Warner Chilcott superiors to recruit prescribing physicians for a speakers program in exchange for speakers fees, which speeches often consisted of little more than pleasantries.

   d. Plaintiffs were instructed by their Warner Chilcott superiors to set up and participate in Medical Education Events ("MedEd events") where very little medical education took place. Some MedEd events took place without speakers, and were basically dinners or happy hours for doctors and staff, and some were dinners where physicians were paid for short presentations.

26. After the acquisition, the president of the pharmaceutics division of Warner Chilcott, W. Carl Reichel, referred to sales representatives as "soccer balls," and explained "kick them to get them moving; when they stop, kick them again; when they run out of air, go get a new soccer ball."

27. While Warner Chilcott had every intention to "thin the herd" of its older sales force, it ostensibly set up a system designed to make its older sales persons fail. To that end, Warner Chilcott "force ranked" sales representatives and managers against their peers. Sales representatives unable to meet the unreasonable demands of Warner Chilcott were force-ranked near the bottom of the sales force, and automatically deemed underperforming and thus fired.

Thus, Warner Chilcott misrepresented to Plaintiffs that they were considered for termination because they would not meet the unreasonable demands of the company, when in fact it has now been discovered through the unsealed filings in the Qui Tam Action that they were slated for termination due to their advanced age.

28. Predictably, Plaintiffs were unable and unwilling to comply with the demands of the employer. They, and many others were eventually "packaged out." They were told they could either accept a retirement package and sign a Separation Agreement containing a waiver of all their legal rights, or be fired on the spot. As a result of these unreasonable demands being placed upon them, both Margolis and Podolnick began to suffer physically  For example, Margolis developed Tinnitis, and was afraid to admit these stress-cause maladies for fear of being fired immediately. Given Plaintiffs age and professional status, the threat of being fired was particularly frightening. As a result of the relentless pressure placed upon them to resign or be fired, Plaintiffs eventually resigned.

29. Although the Separation Agreement signed by all Plaintiffs suggested that the Plaintiffs were given 45 days to consider whether or not to sign the Separation Agreement, that was not in fact true. For example, when Plaintiff Margolis asked for more time to have his attorney review the Separation Agreement before execution, he was told that the "package" would not be offered if he did no sign immediately. Plaintiffs were not given 45 days prior to execution of the Separation Agreement.

30. As a result, each of the Plaintiffs eventually signed under duress and protest the essentially identical Separation Agreement. Defendants have attached an accurate redacted sample of one such representative separation agreement to their filing DE 10-1 in this case. That Separation Agreement is incorporated herein by reference.

31. Under that separation agreement, Plaintiffs were forced to waive any claims for discrimination, including ADEA rights, on threat of having to repay a settlement amount and of having to pay Defendants' attorneys' fees in litigation.

32. That separation agreement contains a clause stating: "It is understood and agreed that Employee shall have no automatic repayment obligations or obligation to pay the Released Parties attorneys' fees and other costs associated with enforcing this Separation Agreement if Employee were to challenge the validity of the ADEA waiver only." *See* Section 10 (Remedies). Accordingly, this Third Amended Complaint exclusively challenges the validity of the purported ADEA waiver. The said waiver was procured by duress and improper methods, and without knowledge by Plaintiffs that they were victims of a systematic discriminatory and illicit scheme.

33. Equitable considerations prohibit the conduct of Defendants, and requires that Plaintiffs' waivers of their ADEA rights be voided by this Court, and that the statute of limitations on this claim be equitably tolled until after the Court can rule in this action. As a result of the carefully orchestrated scheme by Defendants described above, Plaintiffs were prevented from discovering the pernicious nature of Defendants' broadly discriminatory scheme until 2015 or 2016, respectively, and Plaintiffs were thus prevented by Defendants from filing their EEOC claims earlier as a result of the extraordinary clandestine conduct of Defendants.

34. Moreover, in misrepresenting to Plaintiffs that they should resign because they could never meet the performance demands placed on them, and in fraudulently concealing Warner Chilcott's real reason for forcing Plaintiffs out – i.e., Warner Chilcott's intention to replace its more experienced sales force with mostly young and female sales representatives in violation of the ADEA -- Defendants engaged in active misrepresentation to Plaintiffs. Warner Chilcott and its agents knew that they were required to disclose their true motives before forcing Plaintiffs to

waive their ADEA claims, but they actively misrepresented their true motives to Plaintiffs. In misrepresenting their true motivations for forcing Plaintiffs to waive their ADEA claims, Warner Chilcott and its agents acted in bad faith, i.e., with an intent to deprive Plaintiffs of their lawful rights not to suffer age discrimination. Warner Chilcott and its agents knew that by setting up unachievable performance goals, and by misrepresenting to Plaintiff that they had to accept the separation agreement because they could not meet these goals, they would induce Plaintiffs to waive their ADEA rights on pain of receiving nothing after being fired. Warner Chilcott and its agents had a duty to honestly represent the true reasons for forcing Plaintiffs out prior to demanding that they waive their ADEA claims, and breached that duty. The Plaintiffs have suffered damages as a result of Warner Chilcott's active misrepresentations, in that they gave up ADEA rights they otherwise had. The threat of being fired was particularly overwhelming given Plaintiffs age and professional status.

35. The time and place of the misrepresentation in each case was the instance, when representatives of Warner Chilcott informed Plaintiff's of the unreasonable sales goals, and then presented the Separation Agreement to each individual Plaintiffs, and informed them that the execution of the Separation Agreement was required to avoid being fired due to insufficient performance by Warner Chilcott "standards." That point in time, place, and person making the statement differs for each Plaintiff, but occurred separately for each Plaintiff in the first calendar months of 2010.

36. Plaintiffs now realize that Warner Chilcott employed a distinctive hiring bias for sales representatives. It hired almost exclusively women in their early to mid-20s without any prior pharmaceutical sales experience. For example, Plaintiff Neil Podolnick was ultimately replaced by Erica Strimer, a far younger and inexperienced sales person, who rode along with

Podolnick and began to belittle him in front of physicians. All of this was fraudulently concealed from Plaintiffs.

37. Plaintiffs Margolis and Podolnick did not first learn until late October or early November 2015 the truth that Defendants had indeed participated in a large-scale systematic fraudulent scheme to harass and ultimately fire the experienced sales representatives such as Plaintiffs in violation of the ADEA. Plaintiffs Kelly and Alberto Hasson first learned of the Age Discrimination Scheme in July 2016. The details of that scheme were contained in an indictment of Warner Chilcott President W.Carl Reichel dated October 28, 2015 and an information document against Warner Chilcott dated October 29, 2015, as well as at Paragraph 15 in the un-sealed filings in the Qui Tam Action **Exhibit A**. See also **Exhibit B** – Settlement Agreement of Qui Tam Action. Warner Chilcott has subsequently pleaded guilty to the criminal charges, while admitting the bulk of the illegal acts, such as the Age Discrimination Scheme alleged herein. and **Exhibit C** – Correspondence concerning guilty plea by Warner Chilcott to criminal charged for fraudulent misconduct. Exhibits A, B and C were discovered by Plaintiff Margolis in early November 2015.

38. In the case of lead plaintiff Robert Margolis, in late October or early November, 2015, he received a call from a former colleague asking if he had heard "the news" about Warner Chilcott. On November 7, 2015, he conducted a Google search, and found a press release by the Department of Justice Office of Public Affairs, dated October 29, 2015, announcing the guilty plea (the "Press Release"). The Press Release also mentioned a Qui Tam Action that had been filed several years earlier against Warner Chilcott. Not being an attorney, he did not even know what a Qui Tam Action meant nor that this suit ever existed.

39. Margolis began to search for evidence of the Qui Tam Action mentioned in the Press Release, and was eventually able to download a copy of a sealed 262-page Qui Tam

Complaint in the Federal District Court of Massachusetts (Case No. 11-cv-10545-RGS). The Qui Tam Complaint (DE 17 in the Qui Tam Action) showed on its face that it was originally sealed, and thus could not have been discovered with any sort of care. Around the same time, Margolis was also able to find the October 29, 2015 settlement agreement between the government and Warner Chilcott of the Qui Tam Action, and he began to read the documents. **Exhibit B**. Margolis also located the criminal information dated October 28, 2015, and learned that Warner Chilcott had pleaded guilty to the matters alleged in the indictment. **Exhibit C**.

40. Much to Margolis consternation, he found from reading the sealed Complaint in the Qui Tam Action that Warner Chilcott had not simply forced him to resign because I did not want to participate in its fraud or could not meet "performance goals." The Complaint discussed a pervasive scheme of age discrimination at Warner Chilcott, where older, mostly male, sales representatives were forced to resign and young, mostly female representatives were hired to replace them.

41. The first time Margolis learned anything, and could have learned anything with due care, about Warner Chilcott's age discrimination scheme was thus after November 7, 2015. Neither he nor any of the other Plaintiffs had the opportunity or ability to see the allegations in the Complaint in the Qui Tam Action until that time, nor could they have ever even suspected that such a Qui Tam Action had been filed. Margolis was not aware of who, if anybody, had replaced him and the dozens of other older sales reps cut by Warner Chilcott until November 2015. He had left the industry at age 59 after mailing out hundreds of resumés trying to find comparable work, without a single response. Upon information and belief, if had it not been for the semi-related Press Release that the existence of the Qui Tam Action would have never come to his attention.

42. Within days or weeks of learning from the seminal and civil court documents of Warner Chilcott's Age Discrimination Scheme to replace older employees with younger female information, and realizing that the need for him to accept the separation agreement had been misrepresented as being due to failure to meet sales goals and sales practices, Margolis called his old P&G colleague, Neil Podolnick, and asked him if he had seen the settlement of Warner Chilcott's, and whether he was aware of the secret age discrimination scheme deployed by Warner Chilcott. Neil Podolnick at that time appeared to be completely uninformed of the goings-on. Margolis told Podolnick he had retained an attorney and that he intended to do something about this newly-discovered discrimination. Podolnick subsequently also contacted my attorney and retained him.

43. Some time in July, 2016, Robert Margolis, Neil Podolnick, Kelly Hasson and Albert Hasson had a sort of "reunion" of old P&G/Warner Chilcott employees in a pizzeria in Boca Raton, Florida. Albert and Kelly Hasson had moved to Tennessee a few years earlier, and Margolis did not have frequent contact with them. At that reunion, MargolisI mentioned to the Hassons what he had found, and that he had recently filed an age discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). Both Kelly and Albert Hasson stated that they would like to hear what he had found, and that they, too, were considering filing an EEOC Charge. They later also filed an EEOC charge, and joined this lawsuit as plaintiffs.

44. Plaintiffs Margolis and Podolnick thus did not discover, and could not discover with due care, the Defendants' misrepresentations giving rise to this action until November 2015, and Alberto Hasson and Kelly Hasson until July 2016. Once they learned of Defendants' scheme, they proceeded to timely file an EEOC charge and after issuance of a letter to sue to file this action.

The statute of limitations should equitably tolled to enable Plaintiffs' claims for age discrimination if this Court finds the ADEA waiver to be invalid.

45. Attached hereto as **Exhibits D, E, F and G** are affidavits of each of the Plaintiffs attesting to the fraudulent concealment of the Age Discrimination Scheme, which could not have been discovered by them even with due diligence until their review of the un-sealed filings in the Qui Tam Action that came to their attention during the period of October/November 2015 into 2016.

46. Each of the Plaintiffs has administratively exhausted his or her ADEA claims by each separately and timely filing an EEOC Charge and receiving a right-to-sue letter in each case prior to joining as Plaintiff in this case.

47. The Complaint in the above-described Qui Tam Action, which resulted in the settlement and guilty plea, details the discriminatory conduct, much of which was also experienced by Plaintiffs in this action. The illegal practices detailed in the Qui Tam Action, in one form or another, were also imposed on Plaintiffs, which directly forced them to sign the Separation and General Release Agreement.

48. This is an action for declaratory judgment. Plaintiffs seek a declaration that their waiver of ADEA rights under each of their Separation Agreements is invalid and unenforceable, and that they still have retained all of their ADEA rights, which were never effectively waived.

49. There is a bona-fide, actual, present and practical need for the declaration sought in this action, and Plaintiffs are unsure about theirs and Defendants' respective rights related to the validity of the ADEA waiver clause in the Separation Agreement, and Defendants have an actual, present, adverse, and antagonistic interest in the subject matter of this action.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Court issue a declaratory judgment determining (a) that Plaintiffs' ADEA rights waiver was invalid and unenforceable; (b) that the statute of limitations in this action is tolled until such time as is necessary for the said declaratory judgment to issue and for Plaintiffs to thereafter amend this pleading; and (c) that absent a waiver of ADEA rights, Plaintiffs have the right to further amend this complaint and sue for age discrimination; and (d) that Plaintiffs are entitled to such other and further relief as the Court deems necessary and proper.

Dated: June 30, 2018

Respectfully submitted,

LAW OFFICES OF MICHAEL B. WOLK, P.C.
Applicant for Pro Hac Vice Admission as Counsel for Plaintiffs
31 West 34th Street, Suite 7040
New York, NY 10001
Tel: 917-238-0576,
Fax: 973-535-1148
Email: michael.wolk@wolkgroup.com

By: ____/s/ Michael B. Wolk, Esq.
     Michael B. Wolk (MW 2272)